AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>**THE PERSON AND PERSONAL PROPERTY OF LUIS<br>GERARDO LOPEZ FUENTES** | )<br>)<br>)   Case No. 24-SW-115<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___ jurisdiction of the ___ District of ___ Columbia ___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), and 963 | Conspiring to distribute a controlled substance, knowing and intending that such substance would be unlawfully imported into the United States |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days:* ___ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent Eric Montgomery
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___ phone ___ *(specify reliable electronic means)*.

Date: ___ 04/08/2024 ___

*Judge's signature*

City and state: Washington, D.C.

Magistrate Judge Zia M. Faruqui
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original                ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
THE PERSON AND PERSONAL PROPERTY OF
LUIS GERARDO LOPEZ FUENTES

)
)
)
)
)
)

Case No. 24-SW-115

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ jurisdiction of the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 22, 2024 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Magistrate Judge Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:   04/08/2024 _____

_____
*Judge's signature*

City and state:   Washington, D.C. _____

Magistrate Judge Zia M. Faruqui _____
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:  24-SW-115 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is the person and personal property of Luis Gerardo Lopez Fuentes ("FUENTES") (the "PREMISES") while FUENTES and his personal property are located in the District of Columbia. FUENTES is depicted in the image below:



## **ATTACHMENT B**

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), and 963, involving FUENTES and others (the "SUBJECTS") as described in the search warrant affidavit, including, but not limited to the following:

      a.      Transporting drugs, including the controlled substance(s) involved, the previous and current location of the drugs, the intended destination of the drugs, the method of transporting or hiding the drugs, and the identities of those involved in transportation.

      b.      Drug transactions, including the date and time of the transaction, the controlled substance(s) involved, the value of the transaction, the identities of the parties to the transaction, the location(s) in which the transaction occurred, the preparation for the transaction, and communications pertaining to the drug transaction.

      c.      The true and fictitious identities of the SUBJECTS.

      d.      Communication of or between the SUBJECTS pertaining to drug trafficking.

      e.      Coordination between the SUBJECTS to traffic drugs, including traveling, communicating, or engaging in financial transactions.

f.      The current and historical location of the SUBJECTS.

g.      Financial transactions by or between the SUBJECTS pertaining to drug trafficking.

h.      The location, source, and control of drug proceeds.

i.      Records and information that constitute evidence of use, control, ownership of digital devices and things therein.

j.      Records and information that constitute evidence of the state of mind of the SUBJECTS, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation.

2.      Digital devices, including cellphones, tablets, and laptops.

3.      United States currency.

4.      Identifying documents, including passports, government issued identification cards, and credit cards.

5.      Items that have an incriminating character that is immediately apparent, including suspected controlled substances.

6.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

a.      evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such

2

as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.      evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.      evidence of the times the Device(s) was used;

f.      passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.      documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.      records of or information about Internet Protocol addresses used by the Device(s);

i.      records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

3

"favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to obtain from FUENTES the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of any of the Device(s) subject to seizure pursuant to this warrant, where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or

other physical features), that may be used to unlock or access the Device(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital

assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE PERSON AND PERSONAL PROPERTY OF LUIS GERARDO LOPEZ FUENTES** | **Case No. 24-SW-115** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Eric Montgomery, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person and personal property of Luis Gerardo Lopez Fuentes ("FUENTES"), hereinafter the "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since May 2008. I am currently assigned to the Transnational Organized Crime Western Hemisphere ("TOCWEST") Squad of the Washington, D.C., Field Office ("WFO"), a squad that investigates drug trafficking organizations operating in the United States. Prior to my assignment to the TOCWEST, I was assigned to the FBI Washington Field Office Safe Street Task Force. Through my employment with the FBI, I have gained knowledge in the use of various investigative techniques including the following: physical surveillance, undercover operations, confidential informants and cooperating witnesses, controlled purchases of illegal drugs and

firearms, recordings, interviews, trash covers, financial analysis, administrative and grand jury subpoenas, phone service records analysis, electronic surveillance, and search and arrest warrants. I have been working on federal narcotics investigations and have actively participated in several investigations that have led to the arrest and conviction of narcotics distributors. I have conducted interviews and debriefs with individuals associated with narcotics trafficking, and I am familiar with the methods narcotics traffickers use in the United States. During these investigations, I have participated in the execution of search warrants and the seizure of evidence indicative of drug trafficking activities. As an agent of the FBI, I have testified under oath and participated and gained experience in Title III investigations for the enforcement of federal narcotics laws. As a law enforcement officer under 18 U.S.C. § 2510(7), I am empowered by law to conduct investigations and make arrests for federal violations, including offenses enumerated in Titles 18, 21, and 46 of the United States Code.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. Where conversations or statements of others are related herein, they are related in substance and in part. Some of the communications in this investigation were originally in Spanish; in those cases, my knowledge is derived from draft English translations or summaries by a certified FBI translator, by FBI Special Agents, or by a confidential source ("CS-1"), all of whom speak English and Spanish fluently.  This affidavit is intended to show merely that there is sufficient probable

cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that FUENTES has conspired to distribute a controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), and 963. There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

5.    From August 2023 to the present, "CS-1"[1] working for the FBI communicated with FUENTES and an uncharged co-conspirator ("CC-1") via WhatsApp. During these communications, FUENTES discussed drug trafficking and coordinated several drug deliveries. CS-1 preserved and gave me the content of the communications with FUENTES and CC-1. Based on my personal review of Spanish-to-English translations by FBI staff of communications between CS-1 and FUENTES,

---

[1] CS-1 began working with U.S. law enforcement in 2003 in an effort to mitigate exposure to U.S. prosecution. CS-1 previously coordinated maritime and aerial cocaine shipments for Colombian based drug trafficking organizations. CS-1 has testified in several U.S. federal trials for the government, served as an affiant in various federal pleadings, and provided information serving as a basis for federal Title III applications. CS-1 is cooperating for monetary consideration and immigration benefits.

my personal conversations with CS-1, and my training and experience, I have learned the following:

6.      In October 2023, CS-1 agreed to purchase two kilograms of heroin, and FUENTES agreed to arrange the transportation of the heroin from Mexico to the United States. I have personally reviewed a Spanish-to-English translation of those communications that was prepared by an FBI translator. On October 23, 2023, investigators—operating in an undercover capacity—received the drugs in McAllen, Texas. According to an analysis by the Texas Department of Public Safety Crime Laboratory, the drugs comprised approximately two kilograms of heroin. The following is a picture of the heroin FUENTES arranged to be smuggled from Mexico to the United States, which is now in FBI custody:



7.      On February 9, 2024, CS-1 and FUENTES met in Chicago, Illinois, and had a conversation that CS-1 recorded. I have personally reviewed a Spanish-to-English translation of that recording that was prepared by an FBI translator. During the conversation, CS-1 told FUENTES that he received the "two," a reference to the

two kilograms of heroin received on October 23, 2023, without any problems; FUENTES agreed. FUENTES told CS-1 that he had four kilograms that were "en route."

8.      During the meeting in Chicago, CS-1 observed that FUENTES was using a cellphone using the Android operating system. CS-1 also observed FUENTES use a code to unlock the phone. WhatsApp is available to install for Android cellphones.[2] Google Wallet is also available for Android cellphones; Google Wallet allows a cellphone user to save and use credit cards and airplane boarding passes from a cellphone.[3] Finally, the Android operating system allows users to unlock a phone using a code or biometric lock, including a user's fingerprints or face.[4]

9.      On March 4, 2024, CS-1 had a recorded phone call with FUENTES. I have personally reviewed a Spanish-to-English translation of that recording that was prepared by an FBI translator. During the call, FUENTES said he sent for "them" to be moved from Tapachula to a co-conspirator ("CC-2") in Monterrey, Mexico. I am aware that Tapachula is a city in the Mexican state of Chiapas, which borders

---

[2]      *Download WhatsApp for Android*, WHATSAPP, https://www.whatsapp.com/android (last visited Apr. 4, 2024).

[3]      *Google Wallet*, Google Play, https://play.google.com/store/apps/details?id=com.google.android.apps.walletnfcrel&pcampaignid=web_share (last visited Apr. 4, 2024).

[4]      *Authentication*, Android Source, https://source.android.com/docs/security/features/authentication (last visited April 4, 2024).

Guatemala, and Monterrey is a city in the Mexican state of Nuevo León, which shares a border with Texas. The same day, FUENTES sent CS-1 a video depicting what appeared to be four kilograms of heroin. FUENTES said the narcotics were delivered to CC-1's people in Tapachula, Mexico, in order to be transported to Monterrey, Mexico. FUENTES also told CS-1 that co-conspirator 2 ("CC-2") had already picked up the "other 4 at his house." Based on my training, experience, and knowledge of this investigation, I understand that FUENTES meant that he had directed that eight kilograms of heroin be moved from Tapachula to Monterrey, where it would be received by CC-2. A screen shot of the video is depicted below:



10.     On March 17, 2024, CS-1 had a recorded phone call with FUENTES. I have personally reviewed a Spanish-to-English summary of that recording that was prepared by an FBI Special Agent who is fluent in English and Spanish. During the phone call, CS-1 told FUENTES that CC-1 had said, "Two were going to be in Dallas today"; FUENTES responded, "Looks like he is carry 5." FUENTES then said, CC-2

"is trustful, he do his things but he is straight, the truth is it is good to make a good friendship with him." FUENTES asked if CS-1 can move "50 KGs of ice near Sonora and Juarez to the USA." Based on my training, experience, and knowledge of this investigation, I understand that CS-1 and FUENTES were discussing kilograms of heroin. I also understand that CC-1 knew about only two of the five kilograms of heroin that FUENTES's courier was transporting. I also understand that FUENTES is able to obtain large quantities—fifty kilograms—of methamphetamine, commonly referred to as "ice," from a drug supplier other than CC-1 because the investigation to date has revealed no information suggesting that CC-1 supplies methamphetamine. Based on this conversation and the totality of the investigation, I believe that FUENTES is using additional drug suppliers and does not rely on CC-1 as his exclusive source of supply.

11.     Law enforcement has reviewed FUENTES's WhatsApp communication data. FUENTES, who is not known to reside in the United States, is in regular communication with phone numbers with area codes from Miami, Houston, Louisville, Chicago, Palm Beach, and Tennessee. One of the Miami phone numbers with which FUENTES is in contact is associated with a DEA investigation. Based on my training, experience, and knowledge of this investigation, I understand that these locations are significant in the drug trade.

12.     Based on my training, experience, and knowledge of this investigation, I believe that FUENTES has a supervisory role in this drug conspiracy. In addition to coordinating the transportation of the heroin, on March 19, 2024, FUENTES

arranged for three individuals—who have been identified by investigators—to deliver a sample of cocaine to an undercover investigator in Miami, Florida. And on March 27, 2024, FUENTES directed a confidential source ("CS-2") to retrieve $217,000 in cash.

13.     Based on my training, experience, and knowledge of this investigation, I believe that FUENTES is a flight risk because he does not have ties to the United States. In 2016, FUENTES applied for and received a nonimmigration visa. On his visa application, FUENTES said his home address was in Tapachula, Mexico, and he certified that he had no relatives living in the United States. Since 2016, FUENTES has been documented entering the United States nine times. In 2023 and 2024, Fuentes made only two trips to the United States; on both occasions, he left the United States on commercial flights destined for Mexico City. Finally, my review of data from FUENTES's WhatsApp account revealed that more than 87% of FUENTES 342 contacts are Mexico-based phone numbers.

14.     On March 30, 2024, undercover investigators in West Palm Beach, Florida, received approximately two kilograms of suspected heroin. The suspected heroin is depicted here:



A field test of one of the packages of the suspected heroin confirmed that it contains heroin.

15.     FUENTES and CS-1 have discussed meeting in Washington, D.C., so that CS-1 can pay $5,200.00 in United States currency to FUENTES for his role in transporting the heroin received in West Palm Beach. FUENTES told CS-1 that he will be traveling from Mexico to Washington, D.C., by airplane. Investigators expect the meeting to occur on or before April 15.

16.     Based on my training, experience, and the totality of this investigation, I believe that FUENTES currently and will continue to have a cellphone and identifying documents on his person or in his luggage, the PREMISES. On April 6, 2024, investigators—at FUENTES's request—purchased an airplane ticket for

FUENTES to travel from Tapachula, Mexico, to Mexico City, on April 7, and on to Washington Dulles International Airport on April 8. Investigators also obtained a hotel reservation for FUENTES at a hotel in Washington, D.C., and had the reservation information sent to FUENTES. On April 8, FUENTES told CS-1 via WhatsApp that he was in Mexico City and that he was on his way to the airport to travel to the United States to meet CS-1. CS-1 and FUENTES have not discussed the details of their planned meeting in Washington, D.C., including the time and the meeting location within the hotel where the meeting will occur. And WhatsApp is the only way that FUENTES has remotely communicated with CS-1 during this investigation. Thus, FUENTES will need WhatsApp to communicate with CS-1 to learn the time and specific location of the meeting. Finally, in my experience, people who travel internationally carry at least one cellphone and identifying documents on their person or in their luggage in order to facilitate travel.

17.    The property to be searched includes cellphones, tablets, and laptops owned, used, or controlled by FUENTES, hereinafter the "Device(s), while he is in the District of Columbia. During this investigation, FUENTES has regularly used WhatsApp to communicate with CS-1. WhatsApp is an Internet communication application that can be installed on digital devices and can be accessed through a web browser.[5] In order to create a WhatsApp account, a user must have an active phone

_____

[5] *See* WHATSAPP, https://www.whatsapp.com/ (last visited Apr. 1, 2024).

number.[6] Additionally, a user can link multiple devices to the same account, which would enable the user to access the same WhatsApp account from a cellphone, tablet, laptop, and other devices.[7] Finally, WhatsApp stores chat history on the devices used to access a WhatsApp account and provides multiple ways for a user to save chat history indefinitely.[8] Based on my training, experience, and the totality of this investigation, including specifically the WhatsApp records for FUENTES's account and FUENTES's WhatsApp communications with CS-1, I believe that FUENTES has WhatsApp installed on the Device(s) and that the Device(s) contain FUENTES's drug-related communications with CS-1 and others. I also believe, based on the video CS-1 received from FUENTES, that FUENTES uses a device to shoot, store, and share images of drugs.

## **TECHNICAL TERMS**

---

[6]   *See   How   to   register   your   phone   number*, WHATSAPP, https://faq.whatsapp.com/684051319521343/?helpref=hc_fnav&cms_platform=android (last visited Apr. 1, 2024).

[7]   *See   About   linked   devices*, WHATSAPP, https://faq.whatsapp.com/378279804439436/?helpref=hc_fnav&cms_platform=android (last visited Apr. 1, 2024).

[8]   *E.g.,   How   to   back   up   to   iCloud*, WHATSAPP, https://faq.whatsapp.com/902477924463699/?helpref=hc_fnav&cms_platform=iphone (last visited Apr. 1, 2024); *How to back up to your Google Account*, WHATSAPP, https://faq.whatsapp.com/481135090640375/?helpref=hc_fnav&cms_platform=android (last visited Apr. 1, 2024); *How to export your chat history*, WHATSAPP, https://faq.whatsapp.com/1180414079177245/?cms_platform=iphone&helpref=platform_switcher (last visited Apr. 1, 2024).

18.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following terms and their respective definitions:

i.     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii.     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

b.   "Wireless telephone" (or mobile telephone, cellular telephone, or cellphone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.   A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain

programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have

static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

h.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software.

Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

### COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

19.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I

respectfully submit that, if digital devices are found, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

      a.    Individuals who engage in criminal activity, including drug trafficking, often use digital devices, like the Device(s), to do the following: access websites or other information on the Internet to facilitate illegal activity, including navigational maps; communicate with co-conspirators, including through phone calls, messaging applications like WhatsApp, text messages, and emails; store documents and records relating to drug trafficking, including images of drugs distributed and records of payments made or owed for drugs; access financial institutions, including to make or verify payments for drug trafficking activity; keep contact information for drug suppliers and customers; obtain goods or services necessary for drug trafficking, including rental cars, cellphone service, and firearms; and keep and conceal drug proceeds.

      b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium

or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

20.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct

evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

    a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on

a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to traffic drugs, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the

crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

### **METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

21. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are

being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software

requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called

"steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before the examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often

further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

22. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.    Upon securing the person of FUENTES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at that time. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

23.     This warrant permits law enforcement agents to obtain from the person of FUENTES the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometic access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

24.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many

electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

25.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

26.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

27.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

28.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

29.    As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel

may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

30.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

31.     Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial

characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) subject to seizure pursuant to this warrant; (2) hold the Device(s) subject to seizure pursuant to this warrant in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the Device(s) subject to seizure pursuant to this warrant in front of the face of the aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

32.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s). Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information,

and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

33.     I submit that this affidavit supports probable cause for a warrant to search the person and personal property of Luis Gerardo Lopez Fuentes while FUENTES and his personal property are located in the District of Columbia, as described in Attachment A, and to seize the items described in Attachment B.

Respectfully submitted,

ERIC MONTGOMERY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 8, 2024.

MAGISTRATE JUDGE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

Page 33 of 33